**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | **21 Civ. 1375 (CS)** |
| **-against-** | |
| **JOSEPH CIMINO,** | |
| **Defendant.** | |

**[PROPOSED] JUDGMENT AS TO DEFENDANT JOSEPH CIMINO**

The Securities and Exchange Commission having filed a Complaint and defendant Joseph Cimino ("Defendant") having entered a general appearance; consented to the Court's jurisdiction over Defendant and the subject matter of this action; consented to entry of this Judgment; waived findings of fact and conclusions of law; and waived any right to appeal from this Judgment:

## I.

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

(a)  to employ any device, scheme, or artifice to defraud;

(b)      to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c)      to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

II.

IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(a)      to employ any device, scheme, or artifice to defraud;

(b)      to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

III.

Upon motion of the Commission, the Court shall determine whether it is appropriate to order disgorgement of ill-gotten gains and/or a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and, if so, the amount(s) of the disgorgement and/or civil penalty.  If disgorgement is ordered, Defendant shall pay prejudgment interest thereon, calculated from September 18, 2017, based on the rate of interest used by the Internal Revenue Service for the underpayment of federal income tax as set forth in 26 U.S.C. § 6621(a)(2).  In connection with the Commission's motion for disgorgement and/or civil penalties, and at any hearing held on such a motion: (a) Defendant will be precluded from arguing that he did not violate the federal securities laws as alleged in the Complaint; (b) Defendant may not challenge the validity of the Consent or this Judgment; (c) solely for the purposes of such motion, the allegations of the Complaint shall be accepted as and deemed true by the Court; and (d) the Court may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure.  In connection with the Commission's motion for disgorgement and/or civil penalties, the parties may take discovery, including discovery from appropriate non-parties.

IV.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Consent is incorporated herein with the same force and effect as if fully set forth herein, and that Defendant shall comply with all of the undertakings and agreements set forth therein.

V.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that, for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the allegations in the complaint are true and admitted by Defendant, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Defendant under this Judgment or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Defendant of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

VI.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Judgment.

Dated:    December 3  , 2021

_____
UNITED STATES DISTRICT JUDGE

4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>      **Plaintiff,**<br><br>   -against-<br><br>JOSEPH CIMINO,<br><br>      **Defendant.** | 21 Civ. 1375 (CS) |

## CONSENT OF DEFENDANT JOSEPH CIMINO

1. Defendant Joseph Cimino ("Defendant") acknowledges having been served with the complaint in this action, enters a general appearance, and admits the Court's jurisdiction over Defendant and over the subject matter of this action.

2. Defendant has pleaded guilty to criminal conduct relating to certain matters alleged in the complaint in this action. Specifically, in *United States v. Cimino*, Crim. No. 7:21cr334 (S.D.N.Y.), Defendant pleaded guilty to violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) & 78ff and 17 C.F.R. § 240.10b-5] and the federal wire fraud statute [18 U.S.C. § 1343]. In connection with that plea, Defendant admitted the facts set out in the transcript of his plea allocution that is attached as Exhibit A to this Consent. This Consent shall remain in full force and effect regardless of the existence or outcome of any further proceedings in *United States v. Cimino*.

3. Defendant hereby consents to the entry of the Judgment in the form attached hereto (the "Judgment") and incorporated by reference herein, which, among other things, permanently restrains and enjoins Defendant from violation of Section 17(a) of the Securities

1

Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act

[15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

4. Defendant agrees that, upon motion of the Commission, the Court shall determine

whether it is appropriate to order disgorgement of ill-gotten gains and/or a civil penalty pursuant

to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange

Act [15 U.S.C. § 78u(d)(3)] and, if so, the amount(s) of the disgorgement and/or civil penalty.

The Defendant further understands that, if disgorgement is ordered, Defendant shall pay

prejudgment interest thereon, calculated from September 18, 2017, based on the rate of interest

used by the Internal Revenue Service for the underpayment of federal income tax as set forth in

26 U.S.C. § 6621(a)(2). Defendant further agrees that in connection with the Commission's

motion for disgorgement and/or civil penalties, and at any hearing held on such a motion:

(a) Defendant will be precluded from arguing that he did not violate the federal securities laws as

alleged in the Complaint; (b) Defendant may not challenge the validity of this Consent or the

Judgment; (c) solely for the purposes of such motion, the allegations of the Complaint shall be

accepted as and deemed true by the Court; and (d) the Court may determine the issues raised in

the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative

testimony, and documentary evidence, without regard to the standards for summary judgment

contained in Rule 56(c) of the Federal Rules of Civil Procedure. In connection with the

Commission's motion for disgorgement and/or civil penalties, the parties may take discovery,

including discovery from appropriate non-parties.

5. Defendant waives the entry of findings of fact and conclusions of law pursuant to

Rule 52 of the Federal Rules of Civil Procedure.

6.      Defendant waives the right, if any, to a jury trial and to appeal from the entry of the Judgment.

7.      Defendant enters into this Consent voluntarily and represents that no threats, offers, promises, or inducements of any kind have been made by the Commission or any member, officer, employee, agent, or representative of the Commission to induce Defendant to enter into this Consent.

8.      Defendant agrees that this Consent shall be incorporated into the Judgment with the same force and effect as if fully set forth therein.

9.      Defendant will not oppose the enforcement of the Judgment on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure, and hereby waives any objection based thereon.

10.     Defendant waives service of the Judgment and agrees that entry of the Judgment by the Court and filing with the Clerk of the Court will constitute notice to Defendant of its terms and conditions. Defendant further agrees to provide counsel for the Commission, within thirty days after the Judgment is filed with the Clerk of the Court, with an affidavit or declaration stating that Defendant has received and read a copy of the Judgment.

11.     Consistent with 17 C.F.R. 202.5(f), this Consent resolves only the claims asserted against Defendant in this civil proceeding. Defendant acknowledges that no promise or representation has been made by the Commission or any member, officer, employee, agent, or representative of the Commission with regard to any criminal liability that may have arisen or may arise from the facts underlying this action or immunity from any such criminal liability. Defendant waives any claim of Double Jeopardy based upon the settlement of this proceeding, including the imposition of any remedy or civil penalty herein. Defendant further acknowledges

3

that the Court's entry of a permanent injunction may have collateral consequences under federal

or state law and the rules and regulations of self-regulatory organizations, licensing boards, and

other regulatory organizations.  Such collateral consequences include, but are not limited to, a

statutory disqualification with respect to membership or participation in, or association with a

member of, a self-regulatory organization.  This statutory disqualification has consequences that

are separate from any sanction imposed in an administrative proceeding.  In addition, in any

disciplinary proceeding before the Commission based on the entry of the injunction in this

action, Defendant understands that he shall not be permitted to contest the factual allegations of

the complaint in this action.

      12.     Defendant understands and agrees to comply with the terms of 17 C.F.R.

§ 202.5(e), which provides in part that it is the Commission's policy "not to permit a defendant or

respondent to consent to a judgment or order that imposes a sanction while denying the

allegations in the complaint or order for proceedings."  As part of Defendant's agreement to

comply with the terms of Section 202.5(e),  Defendant acknowledges the guilty plea for related

conduct described in paragraph 2 above, and: (i) will not take any action or make or permit to be

made any public statement denying, directly or indirectly, any allegation in the complaint or

creating the impression that the complaint is without factual basis; (ii) will not make or permit to

be made any public statement to the effect that Defendant does not admit the allegations of the

complaint, or that this Consent contains no admission of the allegations; (iii) upon the filing of

this Consent, Defendant hereby withdraws any papers filed in this action to the extent that they

deny any allegation in the complaint; and (iv) stipulates for purposes of exceptions to discharge

set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, that the allegations in the

complaint are true, and further, that any debt for disgorgement, prejudgment interest, civil

penalty or other amounts due by Defendant under the Judgment or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Defendant of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).  If Defendant breaches this agreement, the Commission may petition the Court to vacate the Judgment and restore this action to its active docket.  Nothing in this paragraph affects Defendant's: (i) testimonial obligations; or (ii) right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party.

13.    Defendant hereby waives any rights under the Equal Access to Justice Act, the Small Business Regulatory Enforcement Fairness Act of 1996, or any other provision of law to seek from the United States, or any agency, or any official of the United States acting in his or her official capacity, directly or indirectly, reimbursement of attorney's fees or other fees, expenses, or costs expended by Defendant to defend against this action.  For these purposes, Defendant agrees that Defendant is not the prevailing party in this action since the parties have reached a good faith settlement.

14.    Defendant agrees that the Commission may present the Judgment to the Court for signature and entry without further notice.

15.    Defendant agrees that this Court shall retain jurisdiction over this matter for the purpose of enforcing the terms of the Judgment.

Dated: _12 - 2 - 21_

_____
Joseph Cimino

2021bfcimip

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ---------------------------------x

3   UNITED STATES OF AMERICA

4              v.                        21 CR 334(VB)

5                                        PLEA

6   JOSEPH CIMINO,

7              Defendant.

8   ---------------------------------x

9                                   United States Courthouse
                                    White Plains, N.Y.
10                                  November 15, 2021

11

12

13
    Before:  THE HONORABLE VINCENT L. BRICCETTI, District Judge
14

15

16

17                          APPEARANCES

18
    DAMIAN WILLIAMS
19       United States Attorney for the
         Southern District of New York
20  BENJAMIN GIANFORTI
         Assistant United States Attorney
21

22  FEDERAL DEFENDERS OF NEW YORK, INC.
         Attorneys for Defendant
23  ELIZABETH K. QUINN

24

25

                CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
                          (914)390-4103

2021bfcimip

1          THE DEPUTY CLERK:  United States of America against

2     Joseph Cimino.

3          Will counsel please note their appearance for the

4     record.

5          MR. GIANFORTI:  Good morning, your Honor.  Ben

6     Gianforti for the government.

7          MS. QUINN:  Good morning, your Honor.  Liz Quinn from

8     Federal Defenders for Mr. Cimino.

9          THE COURT:  Good morning.

10          Have a seat, everybody.

11          Ms. Quinn, does your client have an application?

12          MS. QUINN:  Yes, your Honor.  Mr. Cimino is prepared

13     to plead guilty to both Count One and Count Two of the

14     information that's been filed before the Court.

15          THE COURT:  And he's already waived indictment; is

16     that correct?

17          MS. QUINN:  Yes.

18          THE COURT:  And is this pursuant to -- well, there's

19     no plea agreement, correct?

20          MS. QUINN:  Yes.  There's no plea agreement.

21          THE COURT:  But there is a Pimentel letter.

22          MS. QUINN:  Yes.

23          THE COURT:  I have a copy of the Pimentel letter.

24     It's dated April 13th, 2021, so that's some time ago.  That is

25     the operative Pimentel letter here; is that correct?

```
1              MS. QUINN:  Yes, it is, your Honor.

2              THE COURT:  All right.

3              Mr. Cimino, I've been informed that you wish to plead

4    guilty to Counts One and Two of information 21 CR 334.  Is that

5    correct?

6              THE DEFENDANT:  Yes, your Honor.

7              THE COURT:  Now, before I can accept your guilty

8    plea, I need to ask you certain questions, and it's very

9    important that you answer these questions honestly and

10   completely.  I'm doing this so I can make sure you understand

11   your rights and that you are pleading guilty voluntarily and of

12   your own free will.  I also want to make sure that you are

13   pleading guilty because you are guilty and not for some other

14   reason and that you fully understand the consequences of your

15   plea.  So if at any point you do not understand my questions or

16   you want to speak to your lawyer, please just tell me that,

17   because it's very important that you understand every question

18   before you answer it.  And I'll let you speak to your lawyer or

19   I'll answer your question.  Will you do that?

20             THE DEFENDANT:  Yes, your Honor.

21             THE COURT:  Okay.

22             At this point, I'm going to place you under oath.

23             Ms. Hilbert, would you swear the defendant.

24             THE DEPUTY CLERK:  Yes.

25             (Defendant Joseph Cimino sworn)
```

2021bfcimip

```
1          THE COURT:  Sir, you are now under oath, and that
2   means that if you answer any of my questions falsely, you could
3   be later be prosecuted for perjury or for making a false
4   statement.  Do you understand that?
5          THE DEFENDANT:  Yes, your Honor.
6          THE COURT:  You can have a seat.  Just pull your
7   microphone down so it's directly in front of you.  There you
8   go.
9          First of all, what is your full name?
10         THE DEFENDANT:  Joseph Cimino.
11         THE COURT:  And that's spelled C-I-M-I-N-O?
12         THE DEFENDANT:  Yes.
13         THE COURT:  And you pronounce it Cimino?
14         THE DEFENDANT:  Yes.
15         THE COURT:  Okay.  How old are you?
16         THE DEFENDANT:  Fifty-seven.
17         THE COURT:  How far did you go in school?
18         THE DEFENDANT:  High school.
19         THE COURT:  Where was that?
20         THE DEFENDANT:  Italy.
21         THE COURT:  Okay.  Are you currently or have you
22  recently been under the care of a doctor or a psychiatrist for
23  any reason?
24         THE DEFENDANT:  Not recently.
25         THE COURT:  Well, when were you most recently under
```

2021bfcimip

1     the care of a doctor or psychiatrist?

2                 THE DEFENDANT:  2018.

3                 THE COURT:  For what?

4                 THE DEFENDANT:  Mental health and alcohol abuse.

5                 THE COURT:  Okay.  Well, can you describe that in a

6     little bit more detail, because I have to make sure that you're

7     fully competent to enter your guilty plea.

8                 THE DEFENDANT:  Well, I was -- I voluntarily went to

9     a rehab center between November of 2017 until April of 2018 for

10    alcohol abuse and some, in a sense, mental treatment, but

11    because of the alcohol abuse.

12                THE COURT:  Did you have a diagnosis for any

13    mental-health issue?

14                THE DEFENDANT:  No.  Well, I --

15                THE COURT:  Depression?  Anxiety?  I mean, anything

16    like that?

17                THE DEFENDANT:  Well, yes.  Depression.  I've had

18    depression most of my life.

19                THE COURT:  Okay.  Since you completed that program

20    over three years ago, have you had any ongoing treatment for

21    any mental-health issues?

22                THE DEFENDANT:  No.

23                THE COURT:  How are you feeling today?

24                THE DEFENDANT:  Great.

25                THE COURT:  Okay.  Have you ever been treated or --

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

2021bfcimip

```
1   other than what you've just described, have you ever been

2   treated or hospitalized for any other mental illness or

3   mental-health problem, other than what you've just described?

4             THE DEFENDANT:  No.

5             THE COURT:  Other than what you've just described,

6   have you been treated or hospitalized for any drug or alcohol

7   abuse or addiction?

8             THE DEFENDANT:  No.

9             THE COURT:  In the last 24 hours, have you taken any

10  drugs or any medicine or pills?

11            THE DEFENDANT:  No.

12            THE COURT:  Have you consumed any alcohol in the last

13  24 hours?

14            THE DEFENDANT:  No.

15            THE COURT:  Is your mind clear today?

16            THE DEFENDANT:  Yes.

17            THE COURT:  Do you understand what's happening here

18  today?

19            THE DEFENDANT:  Yes.

20            THE COURT:  Have you had enough time and opportunity

21  to discuss your case with your attorney?

22            THE DEFENDANT:  Yes.

23            THE COURT:  Have you discussed with her the charges

24  against you, including any possible defenses you might have?

25            THE DEFENDANT:  Yes.
```

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1           THE COURT:  And have you discussed with her the

2    consequences of entering a plea of guilty?

3           THE DEFENDANT:  Yes.

4           THE COURT:  Are you satisfied with your attorney's

5    representation of you?

6           THE DEFENDANT:  Yes.

7           THE COURT:  Let me just ask a quick question here.

8           The Pimentel letter is addressed to Ms. Brody, who,

9    of course, is retired, but, Ms. Quinn, could you just put on

10   the record, when did you first start personally representing

11   Mr. Cimino?

12          MS. QUINN:  July 15th of 2021.

13          THE COURT:  So you've been working with him now for

14   roughly four months?

15          MS. QUINN:  Yes.

16          THE COURT:  Okay.

17          Does either counsel have any doubt as to the

18   defendant's competence to plead guilty at this time?

19          Mr. Gianforti?

20          MR. GIANFORTI:  No, your Honor.

21          THE COURT:  Ms. Quinn?

22          MS. QUINN:  No, your Honor.

23          THE COURT:  Based on the defendant's responses to my

24   questions and my observations of his demeanor, I find that he

25   is fully competent to enter an informed guilty plea at this

1   time.

2          Now, Mr. Cimino, I'm about to explain certain rights

3   that you have under the Constitution and laws of the United

4   States, and these are rights that you will be giving up if you

5   enter a guilty plea, so, again, please tell me if there's

6   anything you don't understand and either I or your attorney

7   will explain the matter more fully.

8          First of all, you have the right to plead not guilty

9   to the charges contained in this information or persist in your

10  previously entered plea of not guilty.  Do you understand that?

11              THE DEFENDANT:  Yes.

12              THE COURT:  And if you plead not guilty, you have the

13  right to a speedy and public trial by an impartial jury on the

14  charges contained in the information.  Do you understand that?

15              THE DEFENDANT:  Yes.

16              THE COURT:  At that trial, you would be presumed to

17  be innocent and the government would be required to prove you

18  guilty by competent evidence beyond a reasonable doubt before

19  you could be found guilty.  That means that you would not have

20  to prove that you were innocent.  Do you understand that?

21              THE DEFENDANT:  Yes.

22              THE COURT:  If there were a jury trial, you could not

23  be convicted unless a jury of 12 people unanimously agreed that

24  you were guilty beyond a reasonable doubt.  Do you understand

25  that?

1    THE DEFENDANT:  Yes.

2    THE COURT:  At that trial and at every other stage of

3    the case, you would have the right to be represented by an

4    attorney, and if you could not afford an attorney, the Court

5    would appoint one to represent you.  Do you understand that?

6    THE DEFENDANT:  Yes.

7    THE COURT:  During a trial, the witnesses for the

8    government would have to come to court and testify in your

9    presence and your lawyer could confront and cross-examine those

10   witnesses and object to evidence offered by the government.  Do

11   you understand that?

12   THE DEFENDANT:  Yes.

13   THE COURT:  At a trial, your lawyer could also offer

14   evidence on your behalf and you would have the right to use

15   subpoenas to compel witnesses to testify and to obtain evidence

16   to be offered in your defense.  Do you understand that?

17   THE DEFENDANT:  Yes.

18   THE COURT:  At a trial, you would have the right to

19   testify if you chose to do so, but you would also have the

20   right not to testify, and if you chose not to testify, that

21   could not be used against you in any way.  No inference or

22   suggestion of guilt could be drawn from the fact that you did

23   not testify.  Do you understand all that?

24   THE DEFENDANT:  Yes.

25   THE COURT:  Now, if you were convicted at a trial,

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1    you would have the right to appeal that verdict to a higher

2    Court.  Do you understand that?

3              THE DEFENDANT:  Yes.

4              THE COURT:  And do you also understand that, even

5    now, you have the right to change your mind?  You can persist

6    in your not guilty plea and you can go to trial.  Do you

7    understand that?

8              THE DEFENDANT:  Yes, yes, your Honor.

9              THE COURT:  But if you do plead guilty and if I

10   accept your plea, you will be giving up your right to a trial

11   and all of the other rights that go with it that I've just

12   described, other than the right to an attorney.  So if you

13   plead guilty, there will be no trial and I will enter a

14   judgment of guilty and sentence you on the basis of your guilty

15   plea after I consider a presentence report prepared by the

16   Probation Department and also consider any submissions that I

17   get from you, from your attorney and from the government.  Do

18   you understand all that?

19             THE DEFENDANT:  Yes, your Honor.

20             THE COURT:  Finally, if you do plead guilty, you will

21   be giving up your right not to incriminate yourself and I will

22   ask you questions about what you did in order to satisfy myself

23   that you are in fact guilty as charged.  Do you understand

24   that?

25             THE DEFENDANT:  Yes, your Honor.

1          THE COURT:  Now, have you received a copy of the
2  information?  Again, it's docketed as 21 CR 334.
3          THE DEFENDANT:  Yes.
4          THE COURT:  Have you read the information?
5          THE DEFENDANT:  Yes.
6          THE COURT:  Have you discussed it with your attorney?
7          THE DEFENDANT:  Yes.
8          THE COURT:  Do you understand that you're charged in
9  two counts in the information with the following offenses:
10         Count One charges you with securities fraud;
11  basically, making untrue statements of material fact or
12  omitting to state material facts necessary in order to make the
13  statements made not misleading; also employing a scheme to
14  defraud; also engaging in acts that would operate as a fraud or
15  deceit among other persons; specifically, that you made false
16  and misleading misrepresentations to solicit and maintain
17  investments in a tequila company.  Do you understand that
18  that's what you're charged with in Count One?
19         THE DEFENDANT:  Yes, your Honor.
20         THE COURT:  Now, Count Two covers the same alleged
21  conduct.  It charges wire fraud.  And again, specifically, it
22  charges that you made false and misleading misrepresentations
23  by interstate-wire communication to solicit and maintain
24  investments in a tequila company.
25         So do you understand that those are the two offenses

1    with which you are charged?

2              THE DEFENDANT:  Yes, your Honor.

3              THE COURT:  Mr. Gianforti, could you tell me the

4    essential elements of each of these two offenses, starting with

5    Count One.

6              MR. GIANFORTI:  Yes, your Honor.

7              In order to prove the defendant guilty of Count One

8    of the information, which charges securities fraud, the

9    government would have to prove the following elements beyond a

10   reasonable doubt:

11             First, that, in connection with the purchase or sale

12   of a security, the defendant did any one or more of the

13   following:  First, employed a device, scheme or artifice to

14   defraud or, two, made an untrue statement of material fact or

15   omitted to state a material fact that made what was said under

16   the circumstances misleading, or, three, engaged in an act,

17   practice or course of business that operated or would operate

18   as a fraud or deceit upon a purchaser or seller;

19             Second, the defendant acted knowingly, willfully and

20   with the intent to defraud; and,

21             Third, that the defendant used or caused to be used

22   any means or instruments of transportation or communication in

23   interstate commerce or the use of the mails in furtherance of

24   the fraudulent conduct.

25             And in order to prove the defendant guilty of Count

2021bfcimip

1    Two of the information, which charges wire fraud, the

2    government would have to prove the follows elements beyond a

3    reasonable doubt:

4            First, that in or about the times alleged in the

5    information, there was a scheme or artifice to defraud others

6    of money or property by false or fraudulent pretenses,

7    representations or promises;

8            Second, that the defendant knowingly and willfully

9    devised or participated in the scheme or artifice to defraud

10   with knowledge of its fraudulent nature and with the specific

11   intent to defraud; and,

12            Third, that, in the execution of that scheme, the

13   defendant used or caused the use by others of interstate wires.

14            THE COURT:  Thank you, sir.

15            Now, Mr. Cimino, do you understand that if you did

16   not plead guilty to Count One, which is the securities fraud

17   count, the government would have to prove each and every

18   element of that charge beyond a reasonable doubt at trial?

19            THE DEFENDANT:  Yes, your Honor.

20            THE COURT:  And, likewise, do you understand that if

21   you did not plead guilty to Count Two, which is the wire fraud

22   count, the government would have to prove each and every

23   element of that charge beyond a reasonable doubt at trial?

24            THE DEFENDANT:  Yes, your Honor.

25            THE COURT:  I'm now going to tell you about the

maximum possible penalties for these two offenses.

As to Count One, again, the securities fraud charge, the maximum possible penalty is a term of imprisonment of twenty years, a term of supervised release of three years, a fine of the greatest of $5 million or twice the gross pecuniary gain derived from the offense or twice the gross pecuniary loss to persons other than you resulting from the offense, and there's also a $100 mandatory special assessment. That's as to Count One. In addition to that, if you are convicted of Count One, you could be ordered to forfeit all property constituting or derived from proceeds traceable to the commission of the offense.

So do you understand that those are the maximum possible penalties for Count One?

THE DEFENDANT: Yes, your Honor.

THE COURT: Now, Count Two, which is the wire fraud charge, the maximum possible penalty is twenty years' imprisonment, three years supervised release, a fine of the greatest of $250,000 or twice the gross pecuniary gain derived from the offense or twice the gross pecuniary loss to persons other than you resulting from the offense, and also a $100 mandatory special assessment. And just like with Count One, if you're convicted of this offense, you could be ordered to forfeit all property constituting or derived from proceeds traceable to the commission of the offense.

1          Do you understand that these are the maximum possible
2     penalties for this offense, meaning Count Two, the wire fraud
3     offense?
4               THE DEFENDANT:  Yes, your Honor.
5               THE COURT:  Now, as part of your sentence, I can also
6     order you to pay restitution to any person or entity injured as
7     a direct result of your criminal conduct.  Do you understand
8     that?
9               THE DEFENDANT:  Yes, your Honor.
10              THE COURT:  Mr. Gianforti, is there a basis for a
11    restitution order in this case?
12              MR. GIANFORTI:  Yes, there is, your Honor.
13              THE COURT:  And for how much, potentially?
14              MR. GIANFORTI:  Your Honor, the total investments
15    taken in were approximately I think $935,000, so that's
16    probably a rough guideline to what the restitution amount will
17    ultimately be.
18              THE COURT:  Thank you.
19          So what that means, Mr. Cimino, is that, in addition
20    to everything else I've just told you about, I can order you,
21    if you're convicted of these offenses, to pay the money back.
22    Right?  If you defrauded someone of money, it doesn't belong to
23    you, it belongs to them, and I can order you to pay it back to
24    them.  And what the government's telling me is that that could
25    be on the order of $935,000.  Maybe it's more than that or less

2021bfcimip

1   than that, but it's a substantial amount of money.  Do you

2   understand that?

3            THE DEFENDANT:  Yes, your Honor.

4            THE COURT:  Now, I mentioned supervised release a

5   moment ago, and supervised release means that if I sentence you

6   to prison to be followed by a term of supervised release --

7   and, in this case, there's a potential for up to three years of

8   supervised release for each count -- you would be subject to

9   supervision by the Probation Department after your release from

10  prison, and if you violate any of the conditions of supervised

11  release, the term of supervised release could be revoked and

12  you could be returned to prison without a jury trial to serve

13  additional time even beyond your original sentence.  So if that

14  happened, you would not be given credit for the time you served

15  in prison on your original sentence or for any time spent on

16  supervised release.  Do you understand that?

17           THE DEFENDANT:  Yes, your Honor.

18           THE COURT:  You should also understand that parole

19  has been abolished in the federal system, so if you are

20  sentenced to prison, you will not be released early on parole.

21  Do you understand that?

22           THE DEFENDANT:  Yes, your Honor.

23           THE COURT:  Are you a United States citizen?

24           THE DEFENDANT:  Yes, your Honor.

25           THE COURT:  You mentioned you went to high school in

1    Italy.  Are you a naturalized U.S. citizen?

2                    THE DEFENDANT:  Yes, your Honor.

3                    THE COURT:  You were born in Italy?

4                    THE DEFENDANT:  No.  No, your Honor.

5                    THE COURT:  No, you were not born in Italy?

6                    THE DEFENDANT:  I was not.

7                    THE COURT:  Where were you born?

8                    THE DEFENDANT:  I was born in Venezuela.

9                    THE COURT:  But you're now a naturalized U.S.

10   citizen?

11                   THE DEFENDANT:  Yes, your Honor.

12                   THE COURT:  Got it.

13           Now, you're pleading guilty to two different counts

14   in this information.  Do you understand that I will impose a

15   separate sentence on each count?

16                   THE DEFENDANT:  Yes, your Honor.

17                   THE COURT:  So do you further understand that that

18   means that I might order you -- I'm not saying I will, but I

19   might order you to serve the sentences consecutively, meaning

20   one after the other, or I may order you to serve the sentences

21   concurrently, meaning you have to serve both of them at the

22   same time?  Do you understand that?

23                   THE DEFENDANT:  Yes, your Honor.

24                   THE COURT:  Now, if I do decide to impose consecutive

25   sentences, your sentence could be a maximum term of

1    imprisonment of forty years because the maximum is twenty years

2    on each of these two counts.  Do you understand that?

3              THE DEFENDANT:  Yes, your Honor.

4              THE COURT:  Do you further understand that if I

5    accept your guilty plea and adjudge you guilty, that

6    adjudication may deprive you of valuable civil rights, such as

7    the right to vote, the right to hold public office, the right

8    to serve on a jury, the right to possess any kind of firearm,

9    and the right to hold certain professional licenses?  Do you

10   understand all of that?

11             THE DEFENDANT:  Yes, your Honor.

12             THE COURT:  Now, have you talked to your attorney

13   about how the Federal Sentencing Guidelines apply to your case?

14             THE DEFENDANT:  Yes, your Honor.

15             THE COURT:  In determining a sentence, I'm required

16   to consider the guidelines, which are a set of rules and

17   recommendations for determining an appropriate sentence.  I

18   have to calculate the applicable guideline range, consider that

19   range, and determine whether there should be an upward or

20   downward departure from the range.  In addition, I'm required

21   to consider the sentencing factors set forth in Section 3553(a)

22   of Title 18 of the U.S. Code and to impose a sentence that I

23   believe best satisfies the purposes of the criminal law even if

24   that sentence is higher or lower than what the guidelines

25   recommend.  Do you understand all of that?

1    THE DEFENDANT:  Yes, your Honor.

2    THE COURT:  Do you also understand that I will not be

3    able to determine how the guidelines apply to your case until

4    after the presentence report has been prepared by the Probation

5    Office and after both you and the government have had a chance

6    to review, comment on and object to anything in the report?  Do

7    you understand that?

8    THE DEFENDANT:  Yes, your Honor.

9    THE COURT:  Do you also understand that if your

10   attorney or anyone else has attempted to predict what your

11   sentence will be, that prediction could be wrong?

12   THE DEFENDANT:  Yes, your Honor.

13   THE COURT:  It could be right, but it also could be

14   wrong.  Do you understand that?

15   THE DEFENDANT:  Yes, your Honor.

16   THE COURT:  I'm telling you this because you need to

17   understand that no one, not even your attorney or the

18   government's attorney, could be sure now what your sentence

19   will be.  It's my job to decide what your sentence will be, and

20   I'm not going to do that now.  Instead, as I just told you, I'm

21   going wait until after the presentence report is completed and

22   also after I've ruled on any challenges to the report,

23   calculated the range, determined whether there are grounds to

24   depart, and considered the Section 3553(a) factors.  So, at

25   this point, nobody can predict what the sentence will be in

1    your case.  Do you understand all that?

2                    THE DEFENDANT:  Yes, your Honor.

3                    THE COURT:  Now, in this case, the government has

4    written a letter to your attorney.  And, actually, it was

5    written to Ms. Brody, who previously was your attorney when she

6    was at the Federal Defenders.  Now Ms. Quinn has taken over

7    that function.  But there's a letter that I have here addressed

8    to Ms. Brody dated April 13th, 2021 in which the government's

9    attorney explains how he thinks the sentencing guidelines will

10   apply to your case.  Have you discussed this letter with

11   Ms. Quinn?

12                   THE DEFENDANT:  Yes, your Honor.

13                   THE COURT:  And do you understand that if, between

14   now and the sentencing, the government realizes it made a

15   mistake in that letter or gets new information, it could take a

16   different position at sentencing regarding the applicable

17   guidelines range?

18                   THE DEFENDANT:  Yes.

19                   THE COURT:  So this letter is not a promise or a

20   guarantee by the government.  Do you understand that?

21                   THE DEFENDANT:  Yes.

22                   THE COURT:  And it's also not a promise by you.  In

23   other words, it's not an agreement between you and the

24   government.  It's just the government's statement to you of

25   what they think the sentencing guidelines are.  Do you

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1   understand that?

2           THE DEFENDANT:  Yes.

3           THE COURT:  Do you also understand there's nothing in

4   this letter that's binding on me?  I'm not a party to this

5   agreement, so I'm not bound by it.  Do you understand that?

6           THE DEFENDANT:  Yes.

7           THE COURT:  Do you understand that I will be making

8   my own decision as to how the guidelines affect your case and

9   what your ultimate sentence will be?  Do you understand that?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Do you also understand that even if your

12  sentence is different from what your attorney or anyone else

13  told you it might be or if it's different from what you expect

14  it to be or from what's contained in the Pimentel letter that

15  the government has given you, once you've pleaded guilty, you

16  will not be allowed to withdraw your plea?

17          THE DEFENDANT:  Yes.

18          THE COURT:  Do you understand all of that?

19          THE DEFENDANT:  Yes, your Honor.

20          THE COURT:  Okay.  Has anyone threatened you or

21  coerced you in any way or tried to force you to plead guilty?

22          THE DEFENDANT:  No.

23          THE COURT:  Has anyone promised you anything or

24  offered you anything in order to get you to plead guilty?

25          THE DEFENDANT:  No.

1          THE COURT:  Now, I see that there is a forfeiture

2    provision in the -- or a forfeiture allegation, I should say,

3    in the information.  It says that, as a result of committing

4    the offenses charged in Counts One and Two, you shall forfeit

5    to the United States any property, real or personal, that

6    constitutes or is derived from proceeds traceable to the

7    commission of the offense.  Did you discuss this forfeiture

8    provision with your attorney before you decided to plead

9    guilty?

10         THE DEFENDANT:  Yes.

11         THE COURT:  And do you now admit the forfeiture

12   allegation with respect to Counts One and Two of the

13   information and agree to forfeit to the United States any

14   property constituting or derived from proceeds obtained

15   directly or indirectly, as a result of the offenses charged in

16   those two counts?  Do you do that?

17         THE DEFENDANT:  Yes.

18         THE COURT:  Okay.  Now, have you clearly understood

19   everything that has happened here so far today?

20         THE DEFENDANT:  Yes.

21         THE COURT:  Now that you've been advised of the

22   charges against you, the possible penalties that you face and

23   the rights that you're giving up, is it still your intention to

24   plead guilty to Counts One and Two of the information?

25         THE DEFENDANT:  Yes.

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

 1          THE COURT:  With respect to Count One of the

 2   information, which is the securities fraud count, how do you

 3   now plead, guilty or not guilty?

 4          THE DEFENDANT:  Guilty.

 5          THE COURT:  And with respect to Count Two of the

 6   information, which is the wire fraud count, how do you now

 7   plead, guilty or not guilty?

 8          THE DEFENDANT:  Guilty.

 9          THE COURT:  Are you in fact guilty of Count One?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Are you in fact guilty of Count Two?

12          THE DEFENDANT:  Yes.

13          THE COURT:  Are you pleading guilty voluntarily and

14   of your own free will as to Count One?

15          THE DEFENDANT:  Yes.

16          THE COURT:  And are you pleading guilty voluntarily

17   and of your own free will as to Count Two?

18          THE DEFENDANT:  Yes.

19          THE COURT:  Mr. Gianforti, would you please summarize

20   what the government would expect to prove if this case went to

21   trial.

22          MR. GIANFORTI:  Yes, your Honor.

23          So, as your Honor knows, this case is about a tequila

24   company based in Orange County, in Warwick, New York.  It's

25   called 6 Degree Tequila, like six degrees of separation, so

I'll refer to it as 6 Degree.

The evidence against Mr. Cimino would consist of the following, among other things:  E-mails from Mr. Cimino to investors in which he made false and misleading representations about who 6 Degree's investors were and the company's financial performance in order to induce and maintain equity investments in 6 Degree.  I would expect there to be testimony from victims about the representations that Cimino made to them to induce them to invest in the company.  I would expect testimony from a former 6 Degree employee who was able to provide information about how certain representations were in fact false.
Mr. Cimino admitted both to investors in an e-mail and to the FBI during an interview that he had falsified certain investors that he had told other people existed in the company, and he also lied about the company's financial performance in various ways.  There would also be evidence showing that there were investor wires that went interstate into a bank account in Orange County from out of state.  Certain investors were based outside the State of New York.  There would also be a financial analysis, your Honor, showing that investor money went to Cimino's personal account and, from there, it was spent on personal expenses.  And as I mentioned, venue would be established by the fact that the company was based in Orange County.  Mr. Cimino was living in Orange County at that time, and the bank accounts were based I believe in Orange County as

1  well.

2          THE COURT:  How many victims were there?

3          When I say victims, I mean people that invested money

4  based on false material representations.

5          MR. GIANFORTI:  It's somewhere in the neighborhood of

6  15 to 25.  There were some couples that invested, things like

7  that, but it's in that neighborhood.  It's reflected in the

8  Pimentel, but I think it's I think maybe 25 or under.

9          Let me see what the exact range we quoted was.

10          THE DEFENDANT:  Well, the Pimentel says more than 10,

11  so --

12          MR. GIANFORTI:  Yes.  More than 10, but less than 25,

13  I think.  Or what did I say?

14          THE COURT:  It says more than 10.

15          MR. GIANFORTI:  More than 10.  That's right.  It's an

16  enhancement for 10 or more.  So, yes, I think it was in the

17  order of somewhere between 15 and 25.

18          THE COURT:  And I think you said earlier that the

19  total amount of money obtained fraudulently was around

20  $935,000.

21          MR. GIANFORTI:  That's right.

22          THE COURT:  Over what time frame?  It happened in a

23  month, a year or years?

24          MR. GIANFORTI:  It happened over a couple of years.

25  I believe the company was devised around 2014 and investments

were coming in I think as late as 2018.  Maybe 2017.  So it was

over a matter of two or three years when the investments were

coming in.

THE COURT:  Did the investments -- well, it's not

just investments.  It's investments that came in as a result of

false material representations.

MR. GIANFORTI:  Exactly, your Honor.

THE COURT:  People can invest in anything they want

to.

MR. GIANFORTI:  Absolutely.

THE COURT:  I really only care about the ones that

were fraudulently obtained.

MR. GIANFORTI:  Yes.

THE COURT:  Was that at the beginning of when the

company was started or the company started and then

subsequently?

MR. GIANFORTI:  So the --

THE COURT:  Kind of give me a little more of a

sentence of what happened here.

MR. GIANFORTI:  Sure.

So my understanding --

THE COURT:  This is from your perspective, of course.

MR. GIANFORTI:  Of course, of course.

THE COURT:  Just give me a sense of that.

MR. GIANFORTI:  So, your Honor, my understanding is

1    that Mr. Cimino came up with the idea for the tequila company

2    around 2014.  And in fact, the tequila company was established.

3    I want to I guess make the record clear for your Honor there

4    was in fact tequila.  It's actually still available.  You can

5    find it.  It's no longer owned -- or maybe not entirely owned

6    by that company, but it still exists on the market.  It is in

7    fact a real tequila.

8           And over time, there was a financial advisor that

9    started introducing potential investors to Mr. Cimino.  The

10   complaint and really sort of the main thrust of the case

11   focuses on one particular investor, which was an LLC which had

12   three partners behind it.  They had ended up investing quite

13   a -- really, the lion's share of the investments went in

14   through this one LLC.  And I believe Mr. Cimino met the

15   principal of that LLC, who lived in Pennsylvania, I think in

16   2015.  The first investment was 2016 or 2017.  And he's really

17   the focus of the complaint because he, frankly, provided a lot

18   of information to us directly about him, including those

19   e-mails in which he made misrepresentations about -- you know,

20   there were false investor lists, there were these investor

21   circulars that would go around saying, you know, we've sold X

22   amount in the past year, which was all just -- not completely

23   fabricated, but grossly overstating the amount of sales in a

24   given period of time.

25           But in terms of whether there were misrepresentations

1    made from the very beginning, your Honor, I actually don't

2    know, but I can tell you that, in terms of soliciting this very

3    large chunk of investing from this LLC I was mentioning, that

4    was at least a year, I think, into the existence of this

5    tequila company.

6            THE COURT:  Well, these are all relevant facts both

7    to the offenses that are charged, but also, of course, to

8    sentencing, because sometimes people start a business -- and

9    this was a real -- you're saying it's a real business.  It's

10   not like it's a fake business.  They start a real business with

11   good intentions, but something happens and they transition to

12   obtaining money through either exaggerations or outright false

13   statements, and it kind of develops over a period of time as

14   opposed to -- well, a Ponzi scheme would be the opposite of

15   that.  Right?  A Ponzi scheme, there's no basis for it at all,

16   it's just bringing in money to pay off earlier investors.

17   Doesn't sound like that was the case here.

18           MR. GIANFORTI:  No.

19           THE COURT:  This was a real business, but, over time,

20   money was solicited and brought into the business from

21   investors based on what the government would contend were false

22   and fraudulent and material misrepresentations.

23           MR. GIANFORTI:  Yes, your Honor.  And at some

24   point -- as best I know, at some point, it's just that things

25   kind of got away from Mr. Cimino and the company stopped being

1    solvent and he was using the money on personal expenses and

2    that sort of thing.  But not at all like a Ponzi scheme.  This

3    was an actual product available on the market that these

4    investors sampled.  There was an actual distillery in Mexico,

5    an actual importer in this country.  So it was a real business,

6    it just went south.

7                    THE COURT:  Okay.  Thank you, Mr. Gianforti.

8                    All right, Mr. Cimino, did you hear what the

9    prosecutor just said?

10                   THE DEFENDANT:  Yes, your Honor.

11                   THE COURT:  Please tell me in your own words what you

12   did to make you believe that you're guilty of these two crimes.

13                   And if you have something -- you have something you

14   want to read?

15                   THE DEFENDANT:  I have --

16                   THE COURT:  You can.  You're entitled to read

17   something.  I see you have a piece of paper in front of you.

18                   THE DEFENDANT:  Yes.  I have some notes here

19   regarding --

20                   THE COURT:  All right.  Just tell me in your own

21   words what you did that makes you guilty of these crimes.

22                   THE DEFENDANT:  Indeed, I started the business in

23   2014 with all the intentions to create a great company and to

24   have a great product on the market.  Me being in the

25   hospitality business for over 25 years, that was my -- my last

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

kick, so to speak, to do.

I solicited investors through the help of a financial investor who was recommended by a dear friend of mine. And we solicited a lot of investors who invested in the company prior to the product being available on the market.

As time went by and we were growing and we were ready to launch the product in 2016, a large investor came around that wanted to invest in the company. Again, also through acquaintances of this financial investor, we were introduced to this gentleman who leads the LLC that was mentioned a moment ago. And one of the -- one of the requirements from that gentleman was to -- he wanted to see a total amount of investments made in the company in order for him to feel comfortable to invest.

At the time, we were on the cusp of launching the product in Las Vegas. We had the date made. Everything was paid. We were within weeks of doing that. And we needed that investment badly. And going through, I made a bad judgment. I made a bad decision. I made an awful, awful decision. And I exaggerated the amount of investors that were available in the company, and that caused the gentleman, Mr. Fromm, to invest in the company.

The company was, in all means, I wouldn't say it was successful, but it was successful to enter the market. We won many awards, recognitions. As a matter of fact, in 2016, we

1   were the best tequila in the market.  But the -- it just got

2   away from me.  It totally got away from me.  I was a single

3   person running this company that --

4           THE COURT:  Tell me what you mean by got away from

5   you.  What did you do?  You're pleading guilty to a crime, so

6   I'm just trying to -- getting away from you is not really a

7   crime.  What did you do?  You see what I'm getting at here?

8           THE DEFENDANT:  Yes.

9           What did I do was I -- the fact that I misled this

10  one investor regarding how many investors were invested in the

11  company so that he felt comfortable to invest in my company, 6

12  Degree.  And I also -- I overstated the profitability or the

13  sales that our company was making or -- there was a promise of

14  distribution, of large distribution, when, in fact, there was

15  this much, but I made it look like there was that much.  That

16  part got away from me because, once you go there, you just

17  can't go back, and I didn't know how to do it.

18          THE COURT:  Well, the government said that you -- one

19  of the things the government said is you made false

20  representations about the company's financial performance.

21          THE DEFENDANT:  Yes.

22          THE COURT:  Did you do that?

23          THE DEFENDANT:  Yes.  Yes, I did.

24          THE COURT:  The government also said that there was

25  more than 10 and maybe as many as 25 separate victims; in other

2021bfcimip

```
 1    words, people who invested in reliance on these false
 2    representations.
 3                THE DEFENDANT:  Yes.
 4                THE COURT:  Is that the rough number of people that
 5    were defrauded?
 6                THE DEFENDANT:  I believe it is 23.
 7                THE COURT:  Twenty-three?
 8                THE DEFENDANT:  Yes, your Honor.
 9           If I may, I would say 95 percent of all these
10    investors invested money prior to us launching in Las Vegas,
11    prior to me meeting the one gentleman who invested a large
12    amount of money into the company, the one that I embellished on
13    the numbers and embellished on the amount of investors that I
14    had.
15                THE COURT:  So what you're saying is that 95 percent
16    of these investments were made prior to the launch, but did you
17    send out false statements about financial performance and --
18    well, financial performance --
19                THE DEFENDANT:  No, not prior -- not prior to that,
20    but after that, yes.
21                THE COURT:  After that?
22                THE DEFENDANT:  Yes.  After the launch of the tequila
23    and during my many meetings that I had trying to recruit
24    investors, we would make projections -- I would make
25    projections of what the company could potentially sell or
```

```
 1   potentially be successful at.
 2             THE COURT:  This was after the launch?
 3             THE DEFENDANT:  That was prior to the launch, while I
 4   was recruiting the investors, yes.
 5             THE COURT:  Right, but in those representations, were
 6   there false representations made?
 7             THE DEFENDANT:  I don't believe so, your Honor.
 8             THE COURT:  So when were the false representations
 9   made?
10             THE DEFENDANT:  I believe it was once we were
11   actually selling.  It was after 2016.  That's when we were
12   actually selling the -- April 2016 we started selling 6 Degree.
13   And that year it was just -- it was just -- that year just,
14   like I say, just got out of hand.  I wanted to be successful, I
15   wanted the company to be successful, and I just made statements
16   that I shouldn't have.
17             THE COURT:  Why did you do that?  You said you wanted
18   to be successful, but -- so what I'm trying to get at, you
19   know, you're charged with getting money from people based on
20   false statements.  You're not charged with having a rosy view
21   of the likely succes of this company.  That's not really what
22   you're charged with.  People oftentimes have a rosy -- too rosy
23   a view of what they think is going to actually happen, but what
24   you're charged with here is making false statements to get
25   money or perhaps to keep people giving you money that had
```

1    previously given you money.

2              THE DEFENDANT:  I was trying to get more financial by

3    selling my own stocks, my own shares, and in order to keep the

4    company afloat so that we could eventually get on the grain.

5              I'm not sure if I'm doing this correctly.

6              THE COURT:  Did you actually sell shares in this

7    company?

8              You can talk to Ms. Quinn if you want to talk to her.

9              MS. QUINN:  Just one minute, your Honor.

10             THE COURT:  Go right ahead.  Take your time.

11             (Counsel conferred with the defendant)

12             THE DEFENDANT:  I'm sorry, your Honor.

13             THE COURT:  Did you make these false statements in

14   connection with the purchase or sale of securities?

15             THE DEFENDANT:  Yes.

16             THE COURT:  Did you make these statements knowingly

17   and deliberately, with the intention to defraud?

18             THE DEFENDANT:  Yes.

19             THE COURT:  Did you use means of communication in

20   interstate commerce to make these representations; e-mails,

21   telephone calls --

22             THE DEFENDANT:  Yes.

23             THE COURT:  -- and the like?

24             THE DEFENDANT:  Yes, your Honor.

25             THE COURT:  And where were you located when you were

2021bfcimip

1    engaged in these activities?  Where were you physically

2    located?

3              THE DEFENDANT:  Warwick, New York.

4              THE COURT:  That's in Orange County?

5              THE DEFENDANT:  Yes, sir.  Yes, your Honor.

6              THE COURT:  And did this continue up until about

7    2018?

8              THE DEFENDANT:  The end of 2017, before I went to

9    rehab.

10             THE COURT:  Okay.

11             Did you know at the time that you did these things

12   that what you were doing was wrong and against the law?

13             THE DEFENDANT:  I knew it was wrong, yes, your Honor.

14             THE COURT:  And against the law?

15             THE DEFENDANT:  I would assume so, yes, your Honor.

16             THE COURT:  I'm asking you yes or no.

17             THE DEFENDANT:  Yes, your Honor.

18             THE COURT:  Did you know what you were doing was

19   against the law?

20             THE DEFENDANT:  Yes, your Honor.

21             THE COURT:  And did anyone threaten you or coerce you

22   or force you to do these things?

23             THE DEFENDANT:  No, your Honor.

24             THE COURT:  Mr. Gianforti, do you believe there's a

25   sufficient factual predicate for the guilty plea?

1    MR. GIANFORTI:  Your Honor, I feel like what we've
2    been hearing from Mr. Cimino is that he exaggerated, he
3    embellished.  I'm not sure I'm hearing that he lied, that these
4    were false representations, that he -- and I think the
5    important thing, too, is not just that he lied to solicit
6    investments, but also to maintain investments, because at the
7    point at which it became clear this was -- that this company
8    wasn't doing nearly as well as he was representing, presumably
9    people who had invested would want their investments back, but
10   that money was already sunk and, frankly, spent, which is
11   another thing that we didn't hear from Mr. Cimino, that he --
12   you know, this money was syphoned off and used for personal
13   expenses.
14       THE COURT:  Well, okay.  That's several different
15   things in there.
16       MR. GIANFORTI:  Yes.  Fair enough.
17       THE COURT:  I think the first thing you're asking
18   is --
19       MR. GIANFORTI:  I think the falsity is something
20   that's a little lacking here, the acceptance of responsibility
21   for making actually material false statements.  Misleading,
22   embellishing, that sounds like a little bit of a hedge to me.
23       THE COURT:  Well, it was a little bit of a hedge, but
24   the question is is it sufficient.  He did say -- and let me
25   just confirm, but he did say that he deliberately exaggerated

1  the number of investors, overstated sales, exaggerated likely
2  distribution.  He made false representations regarding the
3  financial performance of the company.

4          Did you do all of these things?
5          THE DEFENDANT:  Yes, your Honor.
6          THE COURT:  Did you do those deliberately and
7  knowingly?
8          THE DEFENDANT:  Yes, your Honor.
9          THE COURT:  In other words, you knew that you were
10  overstating sales and overstating the number of investors and
11  overstating likely distributions and making false
12  representations about financial performance.  Did you know you
13  were doing all those things?
14          THE DEFENDANT:  Yes, your Honor.
15          THE COURT:  And what did you do with the money?
16          Did some of the money go into the business?
17          THE DEFENDANT:  All of it went to the business.
18          THE COURT:  Well, the government's saying that some
19  of the money you spent on personal matters, personal expenses.
20          MS. QUINN:  Your Honor, if I may just sort of
21  interject.
22          I think part of the issue is that Mr. Cimino was
23  using -- was doing things to try to further the business and
24  taking personal expenses.  There was a means in the -- I
25  believe it's the amended -- the amended operating agreement

2021bfcimip

1    that he was going to be reimbursed for those, but it had to

2    actually go through like the members of the board and he didn't

3    do that.  So what he was doing was basically reimbursing

4    himself without going through the proper channels.  So there

5    were some legitimate business expenses, but there were also

6    personal expenses.

7            THE COURT:  Yes.  I'm sure it's a mix.  I mean, it's

8    always a mix.  That's what I mean.

9            Did you spend some of this money on yourself without

10    going through the proper steps to have that approved by the

11    board of the company?

12            THE DEFENDANT:  Yes, your Honor.

13            THE COURT:  You had a board, right?  This was a

14    corporation.

15            THE DEFENDANT:  Yes, your Honor.

16            THE COURT:  You were not the sole owner.  There were

17    obviously other people that owned parts of this company, right?

18            THE DEFENDANT:  Yes, your Honor.

19            THE COURT:  And so some of the money you just spent

20    on yourself without getting approval of the board members; is

21    that correct?

22            THE DEFENDANT:  Correct, your Honor.

23            THE COURT:  Mr. Gianforti, do you feel there's a

24    sufficient factual predicate for the guilty plea?

25            MR. GIANFORTI:  I think that element is adequate,

1  your Honor.

2           I think, your Honor, I think you allocuted him on the

3  use of the wires, but maybe just to confirm that he used e-mail

4  in furtherance of the scheme and that there were wires that

5  came from out of state into New York State.

6           THE COURT:  Did you use e-mail in connection with

7  these activities?

8           THE DEFENDANT:  Yes, your Honor.

9           THE COURT:  And were there e-mails that came to you

10 from out of state in connection with this?

11          THE DEFENDANT:  Yes, your Honor.

12          THE COURT:  And some of this money came from

13 investors from out of New York State?

14          THE DEFENDANT:  Yes, your Honor.

15          THE COURT:  Mr. Gianforti?

16          MR. GIANFORTI:  Thank you, your Honor.  That's all

17 for me.

18          THE COURT:  All right.

19          And, Ms. Quinn, do you believe there's a sufficient

20 factual predicate for the guilty plea?

21          MS. QUINN:  Yes, your Honor.

22          THE COURT:  And are there any additional questions

23 either of you would like me to ask the defendant?

24          Anything further, Mr. Gianforti?

25          MR. GIANFORTI:  No, your Honor.  Thank you.

 1          THE COURT:  Ms. Quinn?

 2          MS. QUINN:  No, your Honor.

 3          THE COURT:  And, Ms. Quinn, do you know of any valid

 4  defense that would prevail at trial or any reason why your

 5  client should not be permitted to plead guilty?

 6          MS. QUINN:  No, your Honor.

 7          THE COURT:  Based on the defendant's responses to my

 8  questions and my observations of his demeanor, I find that he

 9  understands his rights and is waiving them knowingly and

10  voluntarily with an understanding of the consequences of his

11  guilty plea, including the potential sentences that may be

12  imposed.  I further find that the guilty plea is voluntary and

13  did not result from force, threats or promises; also, that the

14  defendant has admitted that he is guilty as charged in Counts

15  One and Two of the information.  Further, I find that the plea

16  is supported by an independent factual basis for each and every

17  element of the crimes charged.  The accordingly, I accept the

18  guilty plea and adjudge the defendant guilty of the charges

19  contained in Counts One and Two.

20          I'm going to direct that the Probation Department

21  conduct a presentence investigation and prepare a presentence

22  report.

23          Mr. Cimino, you're going to be interviewed by the

24  probation officer as part of that process.  When that happens,

25  your lawyer will be with you.  Please make sure that if you say

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1    anything at all to the probation officer, that what you say is

2    truthful and accurate.  Can you make sure of that?

3              THE DEFENDANT:  Yes, your Honor.

4              THE COURT:  It will not be in your interest to be

5    perceived by the probation officer as making false statements

6    to the probation officer because that's going to get reported

7    to me.

8              THE DEFENDANT:  Yes, your Honor.

9              THE COURT:  And that also applies to either

10   exaggerating the conduct of somebody else or minimizing your

11   own conduct.  Those things will be reflected in the final

12   presentence report and that will come to me.  Do you understand

13   that?

14             THE DEFENDANT:  Yes, your Honor.

15             THE COURT:  Also, I want you to know that the

16   presentence report is important to me, the final report that's

17   going to get prepared.  And you're going to get to see it

18   before it comes to me.  So, because it's important to me, it's

19   got to be important to you and you need to read it carefully

20   and discuss it with your attorney before the sentencing date.

21   If there are any mistakes in the report, tell your attorney

22   about them so that she can bring them to my attention before I

23   impose sentence.  Will you do that?

24             THE DEFENDANT:  Yes, your Honor.

25             THE COURT:  At sentencing itself, both you and your

attorney will have the right to speak on your behalf before I
impose sentence.

I have a date here of February 18th, 2022 at 2:30
p.m.

Does that work for the government?

MR. GIANFORTI:  Yes, your Honor?

THE COURT:  And for Ms. Quinn?

MS. QUINN:  Yes, your Honor.

THE COURT:  All right.  Sentencing is scheduled for
February 18th, 2022 at 2:30 p.m.

The deadline for any written submissions by the
defendant is going to be two weeks before then, so that will be
February 4th, 2022, and any response from government will be
due February 11th.  Okay.

Now, I know this is a Pimentel letter; therefore,
there's no agreements with respect to the guidelines, some of
these guidelines enhancements and so forth.

Just to give me a little bit of a heads up here,
though, Ms. Quinn, are you going to be arguing, for example,
that the loss -- of course, that's a defined term in the
guidelines -- that the loss was not as much as what the
government says, it was something less than that, or are you
going to be arguing that there were fewer victims than what the
government says?  I'm just trying to anticipate what issues I
may have to deal with at sentencing.

1          MS. QUINN:  So I'm not anticipating challenging any

2     of those; obviously, if the PSR comes up with some other

3     additional calculations, but, no, at this point, I don't

4     anticipate that changing.

5          THE COURT:  All right.  Fair enough.  And I'm not

6     trying to limit you.  You can do whatever you want, but, you

7     know, my experience -- let me just speak from experience -- my

8     experience is that, when there's a Pimentel letter, while the

9     plea is sufficient and I've accepted the plea and everybody's

10    agreed with that, there can be lots of litigation at sentencing

11    about the guidelines range, not just what the sentence ought to

12    be, but what the guidelines range is, and that can be

13    complicated, particularly in a fraud case.  So I'm just trying

14    to get a heads up, you know, now as to what to expect.  But

15    basically you're telling me that's not really the thrust of

16    your sentencing argument.

17         MS. QUINN:  Yes.  This is not going to be fighting

18    over the guidelines.

19         THE COURT:  All right.  Fair enough, fair enough.

20    But, again, I'm not limiting you.  You can fight over anything

21    you want.

22         MS. QUINN:  Yes.

23         THE COURT:  The defendant is clearly out on bail.

24    What is the bail status?  What are the terms of the release?

25         MR. GIANFORTI:  I don't believe he's under

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1    supervision.  I don't remember the exact terms.  I remember it

2    being fairly permissive.  And we're not proposing that he be

3    remanded now, that bail could continue under the existing terms

4    in any event.

5              THE COURT:  You anticipated my next question.

6              I'm just looking at my notes.  It looks like he was

7    released on a $50,000 personal recognizance bond, but without

8    any cosigners.  Does that sound right?

9              MR. GIANFORTI:  That sounds right, your Honor.

10             THE COURT:  It does say pretrial supervision, drug

11   treatment and mental-health treatment.

12             Ms. Quinn, is your client being supervised at all?

13   Is he participating in drug treatment or mental-health

14   treatment?

15             MS. QUINN:  So, your Honor, he is being supervised.

16   He's not participating in treatment, but my understanding is

17   Pretrial has been working with him to get him into an

18   appropriate program.  So it's not that he's not going, it's

19   just that they have not found the right program for him.

20             THE COURT:  All right.

21             Well, the government says that they're not seeking a

22   change in the conditions of release, so, Mr. Cimino, I'm going

23   to continue you on bail release on the same terms that you've

24   been released up until now.

25             You should understand that if you violate any of the

1   conditions, the conditions of your release, you could be

2   remanded.  I could revoke your bail.  So all those things

3   continue to apply.  And then, in addition to that, if you fail

4   to return to my courtroom for sentencing on the date and time

5   set, which, again, is February 18th, 2022 at 2:30 p.m., you

6   would be guilty of a separate crime, which is called bail

7   jumping, for which you could be sentenced to imprisonment and a

8   fine separate and apart from and in addition to whatever

9   sentence you might receive for the crimes to which you've just

10  pleaded guilty.  Do you understand that?

11          THE DEFENDANT:  Yes, your Honor.

12          THE COURT:  And, again, do you further understand

13  that all of the conditions on which you were released up until

14  now continue to apply and that the consequences can be very

15  serious if you violate any of those conditions?

16          THE DEFENDANT:  Yes, your Honor.

17          THE COURT:  So bail is continued as previously set.

18          Is there anything else that we need to do today,

19  Mr. Gianforti?

20          MR. GIANFORTI:  Not from the government.

21          MS. QUINN:  No, your Honor.

22          THE COURT:  All right.  Thank you all very much, and

23  we'll see you on February 18th, 2022.

24

25                        ----

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103